**NEW MEXICO SAVINGS & LOAN ASSOCIATION, a New Mexico Corporation, Appellant,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, a Maryland Corporation, Appellee.**

**No. 71–1032.**

United States Court of Appeals, Tenth Circuit.

Jan. 5, 1972.

John P. Eastham, and Duane C. Gilkey, Albuquerque, N. M., for appellant.

Russell Moore, and William K. Stratvert, Albuquerque, N. M., for appellee.

Before SETH, HAMLEY,* and HOLLOWAY, Circuit Judges.

HAMLEY, Circuit Judge.

New Mexico Savings & Loan Association (New Mexico Savings) brought this diversity action against United States Fidelity and Guaranty Company (bonding company) for recovery under the fidelity coverage of a savings and loan blanket bond. New Mexico Savings alleged that it had suffered a substantial loss through the dishonest, fraudulent or criminal acts of its employees, acting alone or in collusion with others. The bonding company denied the essential allegations of the complaint. The parties tried the case to a jury which returned a verdict for the bonding company. The district court entered judgment on the verdict and New Mexico Savings appeals. We affirm.

On June 26, 1965, the bonding company issued to New Mexico Savings a savings and loan blanket bond. It thereby agreed to indemnify New Mexico Savings for any loss sustained through any "dishonest, fraudulent or criminal act of any employee, acting alone or in collusion with others." Through a rider to the bond, which became effective September 23, 1965, the coverage was increased to three hundred thousand dollars, together with ten thousand dollars coverage for audit expense. The bond was in full force and effect at all material times.

Over a ten-month period, commencing in November, 1965, and ending on August 10, 1966, New Mexico Savings incurred a loss in an amount exceeding $363,000. This loss occurred through

---

* Of the Ninth Circuit, sitting by designation.

the overdisbursement of funds during this period to Jan Medik Contractors, Inc. (Medik). The loss on the Medik account resulted from disbursements of New Mexico Savings funds on interim construction loans to Medik over and above the aggregate of the promissory notes given by Medik and the value of the residential construction mortgages.

New Mexico Savings sought to prove that the loss was due primarily to the dishonest, fraudulent or criminal acts of Virgil Stovall, a bookkeeper and later Assistant Secretary of New Mexico Savings. If not due to the culpability of Stovall, New Mexico Savings urged, it was due to the culpability of Lilburn Homan, president of that institution, from whom Stovall received instructions.

At the close of all the evidence New Mexico Savings moved for a directed verdict in its favor. The motion was denied. After the jury returned its verdict, New Mexico Savings moved for judgment notwithstanding the verdict and, in the alternative, for a new trial on the ground that the verdict is against the weight of the evidence. These alternative motions were also denied. New Mexico Savings argues that the district court erred in denying the motions described above.

■ Motions for a directed verdict or for judgment notwithstanding the verdict may be granted only when the evidence is all one way or so overwhelmingly in favor of the movant that the trial court in the exercise of its sound discretion would be required to set the contrary verdict aside. Chicago, Rock Island and Pacific Ry. Co. v. Howell, 401 F.2d 752, 754 (10th Cir. 1968). *Cf.* Denning v. Bolin Oil Co., 422 F.2d 55, 57 (10th Cir. 1970). In applying this rule, the court must view the evidence in the light most favorable to the party opposing the motion, and that party is to be given the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

Appellant New Mexico Savings recognizes the heavy burden it carries under the rules noted above, but insists that in this case a directed verdict in its favor or a judgment notwithstanding the verdict should have been granted. The savings and loan institution calls our attention to extensive evidence which it believes requires that result. The tendency of this evidence is to show that Stovall assured the board of directors of New Mexico Savings that the advancements to Medik were well secured; that Stovall violated New Mexico statutes which prohibit stock building and loan associations from advancing any loans which are not "amply secured"; and that Stovall disregarded the unwritten policy of New Mexico Savings that loans would only be committed and advanced to an amount equalling seventy-five percent of the sale price of the house under construction as per contract, or seventy-five percent of the FHA appraisal.

The evidence relied upon by New Mexico Savings also tended to show that Stovall paid Medik's bills from New Mexico Savings funds in advance of Medik money coming in on assigned receivables; that Stovall participated in a number of undisclosed personal dealings with Medik which created a conflict of interest; that Stovall recorded the Medik transactions in two accounts in such a way as to conceal the developing overdisbursements; that Stovall, through improper coding, striking over correct work done by his subordinates, and by making other assertedly false entries, caused substantial receipts, unrelated to the Medik account, to be credited against that account; that Stovall knowingly allowed the over-disbursed condition to develop beyond correction before he notified his superiors of the problem; that Stovall neglected to collect interest on Medik loans amounting to at least twenty-four thousand dollars; and that Stovall was seen to destroy a number of paid Medik drafts.

This evidence, considered alone, presents a persuasive case for New Mexico

Savings. However, viewed in the light of other evidence relied upon by the bonding company, quite a different picture is presented. This evidence tends to show that Stovall was hired by New Mexico Savings in January, 1965, to head its accounting department, despite the fact that he had no previous experience working for a lending or financing institution.[1] After Stovall began working for New Mexico Savings, he soon realized that he "didn't know what was going on." He thought he could learn the work, but, according to his testimony, it did not take him long to discover that "there was a lot more to learn than [he] thought there was." New Mexico Savings, at that time, was closing loans aggregating two million dollars every month and was servicing mortgages totaling from seventy-five to eighty million dollars and there was evidence to indicate that Stovall was overworked.

In 1963 there had been a serious dispute within New Mexico Savings' board of directors about whether or not the association should go on with construction financing. Several members of the board of directors thought that construction lending was a "risky business." Homan, president of New Mexico Savings, led the group that believed the association should engage in such financing, and his view prevailed. This activity continued to grow, with Homan making all of the business decisions. Stovall worked under Homan's supervision, and this was particularly true with respect to the Medik account. By the summer of 1965, New Mexico Savings was financing between fifteen and twenty homes for Medik at any one

time and, at Homan's direction, Stovall handled the accounting on these loans.

In the fall of 1965 Medik got behind with its creditors and Jan Medik, the head of that company, came to Stovall stating that he needed around sixty thousand dollars to cover some back debts.[2] Stovall referred Jan Medik to Homan. An arrangement was then made whereby the association agreed to pay Medik's back bills and, in turn, would receive all of the receipts on the houses directly from the title companies when the houses were sold. As a condition of this agreement, Homan required Jan Medik to assign the stock of Medik to New Mexico Savings as a guarantee.

Before this agreement, construction financing for Medik had been handled, generally, through Account No. 1541, entitled "Construction Financing." Connected with this account were individual cards, segregated by address, and listing all disbursements and advancements for each house. Under the new arrangement, however, Medik's back bills could not be identified by house or address, and a separate account was therefore set up for Medik to take care of back bills. This was Account No. 2007, entitled "Builders' Trust Account." This was made a credit account.

It was originally the intention of the association that the back bills of Medik were to be picked up from the equities which Medik represented it had in various properties. However, problems with this procedure were encountered almost immediately. Some of the bills which

---

1. Stovall is a high school graduate but had never gone to college. After serving in the Army Air Corps, he had run a cafe, worked as an insurance salesman, worked on a maintenance gang for the railroad, and then went to work for a service station. Having had a year of bookkeeping in high school, he started keeping books for the service station. From the service station he went to work at a feed mill in Texas where he also kept books. Before joining New

Mexico Savings, Stovall also worked for a tire company, training to be a credit and operating manager, and worked for a C.P.A. for six to nine months, and worked for a contractor in Albuquerque (presumably as a bookkeeper).

2. Actually, Mr. Medik recalled at the trial, the bills at that time could have been as high as one hundred and forty thousand dollars above seventy-five percent of the construction loans.

the association was paying directly were on houses concerning which Medik's account had already been closed. Stovall testified that Homan stated almost from the start that the association could advance up to one hundred percent on these properties since all of the proceeds were coming to the association from the title companies. Stovall got the impression that he was to advance money from the association's general account, in anticipation that Medik monies would be coming in. The evidence reveals several instances wherein Homan specifically authorized Stovall to make such disbursements.

Throughout his testimony, Jan Medik emphasized that for a decision of any consequence on his company's account he would have to go directly to Homan. Testimony favorable to the bonding company tends to show that Stovall seriously attempted to keep track of the Medik account by various lists that showed what Medik owed on the 2007 and 1541 accounts. But he could not ascertain from those records how much security the association had against the amount that was owed. For example, there was no way to estimate the additional security which was represented by the difference between the mortgage notes and the net proceeds the association was to receive from the title companies.

The evidence tends to show that Stovall did not conceal the fact that Account 2007 was for Medik. Several employees of New Mexico Savings were aware of this. There was also testimony that Stovall's action in transferring balances from Account 2007 to Account 1541, and later back again, was to save time for the auditors. For the period ending March 31, 1966, there was a complete audit of all the books and accounts of the association performed by an independent C.P.A. Two accountants who made this audit agreed that the status of Medik's account was not hidden. Stovall testified that his discovery that Medik's account had gotten so

far out of line came as a complete surprise to him.

There is no evidence whatever of any embezzlement by Stovall, or that he profited from the overdisbursement of funds to Medik. While his side transactions with Medik approached conflict of interest proportions, there was no evidence that, because of such transactions, Stovall relaxed his bookkeeping supervision over the Medik account. His loyalty to the association was further demonstrated by his refusal to cooperate with Medik in the latter's subsequent lawsuit against New Mexico Savings, although Stovall was then no longer connected with the association.

Stovall admitted that he had lied to Morgan Nelson, a member of the association's board of directors, on at least two occasions concerning the extent and condition of construction financing. Stovall excused his lying by saying that Homan had directed him to conceal the true facts of construction financing from members of the board of directors. Moreover, Stovall's misstatements to Nelson were with respect to the association's construction financing prior to the transactions with Medik. Considered in the context of all the evidence we do not believe the jury was required to find that Stovall's misstatements to Nelson so tainted Stovall's conduct as bookkeeper and Assistant Secretary as to establish liability under the fidelity bond.

As the jury knew, Stovall was aware that the board of directors had acquiesced in Homan's "one-man" control of the association, and also of the division of opinion as to the wisdom of financing Medik's construction projects. The jury could reasonably conclude that Stovall had proceeded on the reasonable assumption that Homan had only the best interests of the association in mind in seeing to it that board members kept hands off the association's construction financing operations for the time being.

New Mexico Savings urges that, if Homan's directions exculpate Stovall for

lying to Nelson, the association should still be entitled to recover on the theory of Homan's culpability. Homan was also covered under the bond. However, if these circumstances exculpate Stovall they also exculpate Homan, because the jury could reasonably find that the underlying motivation of each was to serve the best interests of the association.

■ There is ample basis to conclude from these, and other acts by Stovall and Homan, that they exercised poor judgment, made serious mistakes and were generally negligent in handling the affairs of the association. However, considering all the evidence in the light most favorable to the bonding company, as we are required to do, we hold that the jury could reasonably find that neither Stovall nor Homan acted dishonestly, fraudulently or criminally with regard to the Medik account. The jury verdict is supported by substantial evidence.

It follows that the district court did not err in denying the motions for a directed verdict and for judgment notwithstanding the verdict. We also conclude that the district court did not abuse its broad discretion in denying the alternative motion for a new trial. *See* Atchison, Topeka and Santa Fe Ry. Co. v. Jackson, 235 F.2d 390, 394 (10th Cir. 1956) ; 6A Moore's Federal Practice (2d Ed.) ¶ 59.08 [5], at page 3820.

New Mexico Savings argues that the trial court erred in sustaining objections by the bonding company to questions asked the expert accounting witness of New Mexico Savings. The questions to which New Mexico Savings refers called for this witness, Gordon Paul, to express his expert opinion as to whether an accounting concealment was indicated by the books and records of New Mexico Savings.

Paul, who is a certified public accountant with twenty years of experience in that field, had made a special examination of the books and records of New Mexico Savings for the purpose of giving his expert opinion in connection with this bond claim. At the trial he testified at length concerning his examination. He was then asked for his opinion on the issue of whether the books and records of the association indicated an "accounting concealment" by its bookkeeper of the true state of facts concerning the Medik account. He was also asked for his opinion as to whether such "accounting concealment" was deliberate or negligent. The bonding company objected to these questions on the ground that the answers thereto would "invade the province of the jury." The trial court sustained the objections.[3] New Mexico Savings made no offer of proof, pursuant to Rule 43(c), F.R.Civ. P., as to what opinions Paul would have expressed.

As this court said in Downie v. Powers, 193 F.2d 760, 768 (10th Cir. 1951), the obvious purpose of Rule 43(c) is to permit the examining attorney to make such record that an appellate court can determine whether there was reversible error in excluding the question. Reserving for the moment the problem of whether Paul's expression of opinions could have impermissibly invaded the province of the jury, it is apparent that such opinions would have been material to a relevant issue in the litigation. But the exclusion of those opinions would still not be reversible error unless they turned out to be favorable to New Mexico Savings' theory of the case. Without an offer of proof we have no way of knowing whether Paul's opinion would have fulfilled the association's evident expectations as to what he would say. *See* 5 Moore's Federal Practice (2d Ed.), ¶ 43.11, pages 1381–1382.

■ Assuming, however, that we may nevertheless reach this issue on the merits (*see* Massachusetts Mut. Life Ins. Co. v. Brei, 311 F.2d 463, 465, 474 (2d Cir. 1962)), we conclude that the

3. Paul was permitted to express the opinion that Stovall had not complied with standard accounting requirements that current and complete financial information reach management as fast as possible.

trial court did not abuse its discretion in upholding the bonding company's objections. Where the matter under inquiry is properly the subject of expert testimony, it is no objection that the opinion sought to be elicited is upon the issue to be decided. Millers' National Insurance Company v. Wichita Flour Mills Company, 257 F.2d 93, 100 (10th Cir. 1958). *See* Transportation Line v. Hope, 95 U.S. 297, 298, 24 L.Ed. 477 (1877).

█ Expert testimony is appropriate when the subject of inquiry is one "which jurors of normal experience and qualifications as laymen would not be able to decide on a solid basis" without the technical assistance of one having unusual knowledge of the subject by reason of skill, experience or education. Nelson v. Brames, 241 F.2d 256, 257 (10th Cir. 1957). As indicated in the *Nelson* case, the application of this rule rests largely in the sound judicial discretion of the trial court, and when exercised within normal limits, such discretion will not be disturbed on appeal.

The trial court could reasonably have determined that, in essence, the opinions solicited from Paul went to Stovall's state of mind with respect to the reason he kept the association's books the way he did. Such an inquiry would involve far more than an examination of the books and would embrace Stovall's whole course of conduct, the instructions under which he acted, his background experience, and the specific problems which confronted him.

While the trial court observed that the expressions of Paul's opinion would invade the province of the jury, it seems to us that the court was actually determining that the jury, assisted by Paul's description of how the books were kept, and evidence as to all these other matters, did not need expert help in deciding what Stovall's state of mind was at the time. As the court said, in upholding the objections, ". . . the jury is very intelligent here, they know the answer without your interrogating the witness." We hold that, in so determining that the matter under inquiry was not properly the subject of expert testimony, the trial court did not abuse its discretion.

█ New Mexico Savings argues that the trial court erred in sustaining objections by the bonding company to questions during the cross-examination of the bonding company's expert accounting witness, William Bonds. These questions seem to have called for a disclosure of certain written opinions of another accountant, Daniel Ezzel, included in Bonds' working papers. Ezzel is an accountant in Bonds' accounting firm who had worked on the examination of the association's books.

Ezzel's opinions tended to support New Mexico Savings' theory that Stovall was consciously and deliberately concealing from management the extent and nature of the indebtedness Medik owed the association. Ezzel's opinion, as revealed in the working papers, also tended to undermine Bonds' own opinion, testified to in court, that the utilization of Accounts Nos. 1541 and 2007 was appropriate, and that assertedly false entries made by Stovall in July, 1966, had no effect on the bond claim.

However, New Mexico Savings does not point to any particular questions asked of Bonds on cross-examination where objections were sustained by the trial court. All that New Mexico Savings calls attention to in the record is the fact that when, during Bonds' cross-examination, counsel began referring to Ezzel's notations, the court, at the bonding company's request, called opposing counsel and Bonds to the bench out of the hearing of the jury, where an off-the-record conference was held. When cross-examination was resumed on the record no mention was made of Ezzel, no objection was made to any question asked, no offer of proof was made, and the association neither objected to this procedure nor made any reference to the subjects discussed off the record.

We conclude that this argument concerning suppression of notations by Ezzel has no factual basis in any part of

the record which is before us. Moreover, most of Ezzel's notations, as described in New Mexico Savings' brief, consisted primarily of expressions of opinion as to Stovall's state of mind. It would not have been an abuse of discretion to exclude such conclusions by Ezzel, in view of what we have said above concerning the argument that Gordon Paul should have been permitted to express his expert opinion as to whether Stovall was guilty of an accounting concealment.

New Mexico Savings next contends that the trial court erred in allowing the bonding company, over objection, to read to the jury portions of the deposition of its own witness, Jan Medik, who was on the stand, without a showing of hostility.

After Jan Medik, called by the bonding company, had testified at some length and professed lack of recollection of many incidents, the court held a conference in chambers concerning the problem. Counsel for the bonding company at that time indicated his intention to utilize Mr. Medik's pre-trial deposition for the purpose of refreshing Mr. Medik's memory in areas where the witness professed not to remember facts to which he had earlier given affirmative testimony in the deposition. Counsel for New Mexico Savings replied that he would "simply object to the use of the depositions to impeach the witness." The court ruled that the depositions could be used, not to impeach the witness, but to "prompt" him, or refresh his recollection.

When testimony was resumed, counsel for the bonding company made use of excerpts from Mr. Medik's pre-trial deposition on several occasions. Each time, before reading the excerpt, counsel asked Mr. Medik a particular question and received the answer that Mr. Medik did not know, or could not "tell you for sure," or that he did not remember. Counsel for the bonding company would then, in the jury's hearing, read Mr. Medik's deposition answer to a similar question and inquire whether that refreshed Mr. Medik's recollection. Sometimes the excerpt read from the deposition refreshed the witness' memory, but usually it did not.

During the use of the deposition to refresh the witness' recollection, counsel for New Mexico Savings neither objected to the procedure used to refresh Mr. Medik's memory, nor suggested to the court that it might be preferable for the witness to review the deposition answers silently so that the deposition testimony would not be heard by the jury.

■■■ We can agree that, where a witness has merely professed an inability to remember facts previously testified to in a deposition, the party calling the witness may not introduce the deposition testimony either as substantive evidence, or as a prior inconsistent statement to impeach the witness. *See* Taylor v. Baltimore & Ohio Railroad Co., 344 F.2d 281, 284 (2d Cir. 1965); Westinghouse Electric Corp. v. Wray Equipment Corp., 286 F.2d 491, 493 (1st Cir. 1961). In the present case, however, the bonding company made no attempt to introduce the deposition as evidence. The sole stated purpose for reading the excerpts was to refresh Jan Medik's recollection, and this was the sole ground upon which the court allowed the deposition to be read.

The precise question presented, then, is whether a party may, in the presence and hearing of the jury, read portions of his own witness' pre-trial depositions for the purpose of refreshing the recollection of the witness who has, because of a faulty memory, been unable to answer questions asked of him at trial.

Where prior grand jury testimony of a witness has been resorted to for such a purpose, the use of the testimony has been held to rest in the sound discretion of the trial judge. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 233, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Collins v. United States, 383 F.2d 296,

301 (10th Cir. 1967).[4] We perceive no reason why the same rule should not apply to the use of witnesses' pre-trial depositions. In the present case, the trial judge could reasonably determine that use of Jan Medik's prior deposition was needed for purposes of refreshing his recollection, and that it was not deliberately used for the purpose of getting otherwise inadmissible evidence before the jury. We conclude that the trial court did not abuse its discretion in permitting this use of Jan Medik's deposition.

We think it appropriate to note our belief that, in most circumstances, the best practice would be for the trial court to require that the witness silently reread his pertinent deposition testimony, so that deposition answers which are not admissible as evidence will not be heard by the jury. However, we decline to rule that the reading of the deposition excerpts before the jury was error in this case. New Mexico Savings objected only to the use of the deposition as impeachment and, at the trial, did not make the point that if the deposition were to be used to refresh Jan Medik's memory, then Medik should be asked to silently read the deposition questions and answers.[5]

New Mexico Savings urges that the trial court erred in sustaining objections by the bonding company to questions counsel for New Mexico Savings asked its president, Ed Leslie, during rebuttal. These questions concerned the background of the settlement of a law-suit Jan Medik commenced against New Mexico Savings in 1966.

New Mexico Savings made no offer of proof as to what Leslie would have testified to in response to the questions asked of him in rebuttal.[6] Thus if there was error in sustaining the objections to these questions, we are unable to determine if it was prejudicial.

On the merits, the line of inquiry which the trial court cut off was with respect to a collateral issue. A trial court may, in its discretion, exclude evidence relating to collateral issues. See Patterson v. McWane Cast Iron Pipe Company, 331 F.2d 921, 923 (5th Cir. 1964). We are not convinced that the trial court abused its discretion in curtailing Leslie's testimony in the manner described.

Finally, New Mexico Savings contends that the trial court erred in refusing to give, either in whole or in substance, the association's requested instructions numbered 6, 7, 8, 10, 15, 17, 19, 20, 22 and 23.

We have examined New Mexico Savings' arguments with respect to each of these requested instructions. In our opinion there was no prejudicial error in the refusal to give any of these instructions. The court's instructions, taken as a whole, fairly and adequately presented to the jury New Mexico Savings' theory of the case, and correctly advised the jury as to the applicable law.

Affirmed.

---

4. Speaking of the trial judge's exercise of such discretion, the Supreme Court said, in the *Socony-Vacuum* case:
   "He sees the witness, can appraise his hostility, recalcitrance, and evasiveness or his need for some refreshing material, and can determine whether or not under all the circumstances the use of the grand jury minutes is necessary or appropriate for refreshing his recollection." (310 U.S. at 233, 60 S.Ct. at 849).

5. It may also be assumed that, upon request, a party adversely affected by the use of a deposition as a memory-refreshing device would be entitled to an instruction informing the jury that the excerpts read from the deposition do not constitute evidence. We do not decide this question, however, because New Mexico Savings did not request such an instruction, and does not complain here of the failure to give such an instruction.

6. New Mexico Savings does not even give us this information in its brief on appeal.