Elizabeth A. HONCE, Plaintiff–Appellant,

v.

Jose A. VIGIL, d/b/a Dorado Investments, Inc., a/k/a Villa Chaparral Mobile Home Sub–Division; Dorado Investments, Inc., Defendants–Appellees.

No. 92–2074.

United States Court of Appeals, Tenth Circuit.

Aug. 2, 1993.

Rehearing Denied Aug. 25, 1993.

Marcia D. Greenberger, National Women's Law Center, Washington, DC (Richard J. Rubin and Carol Oppenheimer, Santa Fe, NM, with her on the brief) for plaintiff-appellant.

Paul J. Kennedy, Albuquerque, NM, for defendant-appellee.

Before SEYMOUR and KELLY, Circuit Judges, and LEONARD, District Judge.[†]

PAUL KELLY, Jr., Circuit Judge.

Plaintiff-appellant Elizabeth A. Honce appeals the dismissal of her Fair Housing Act suit. *See* 42 U.S.C. § 3601 ("Title VIII"). She claims that the court erred in granting judgment as a matter of law for Defendant-appellee Jose A. Vigil on both her Title VIII claims as well as her covenant of quiet enjoyment claim. Our jurisdiction arises under 28 U.S.C. § 1291 and we affirm..

*Background*

In August 1990, Ms. Honce arranged to rent a lot in Mr. Vigil's mobile home park. Ms. Honce placed a mobile home on the property in mid-September and moved in at the beginning of October. Mr. Vigil invited Ms. Honce to accompany him socially on three occasions in September, prior to her moving in. He first asked her to attend a religious seminar. She told him that she would try to attend, but did not. He then offered to take Ms. Honce and her young son to the state fair. She told him that she would think about it, but did not go. At their next meeting, he asked her to visit some property with him. She politely declined. Finally, two days before moving in, Mr. Vigil asked, "When can we go out?" She responded that she did not wish to go out with him at any time. He told her that he had only wanted to be friends and did not ask her out again. Both parties testified that Mr. Vigil never used profanity or made sexual advances or remarks.

After Ms. Honce moved in, she and Mr. Vigil had a series of disputes over the property. The first involved a plumbing problem, which Mr. Vigil refused to pay for because he claimed that the problem was not in his line. The next arose over the building of a fence for Ms. Honce's dog. Mr. Vigil required all tenants with dogs to erect fenced dog-runs. He prohibited the use of cement, and preferred that his own fencing materials be used. When Mr. Vigil sent a laborer over to start work on a fence for Ms. Honce as a favor to her, she stopped the work and informed him that she wanted no favors. Mr. Vigil also provided rocks to be used as stepping stones, which Ms. Honce did not want. These rocks were provided to all tenants.

The primary confrontation occurred on October 24, 1990. Ms. Honce had purchased fencing from Sears and workers began construction of the fence using cement. Mr. Vigil arrived, upset with the situation, and sent the workers away. He was unhappy with the use of cement, as well as Ms. Honce's failure to seek his consent to build as required by the rental agreement. He also yelled at a worker who was repairing Ms. Honce's door, although that worker did not leave. Ms. Honce and Mr. Vigil then entered into a shouting match, during which he threatened to evict her. As Mr. Vigil entered his truck to leave, Ms. Honce's dog ran in front of the vehicle. Mr. Vigil "revved" the engine and Ms. Honce retrieved her dog, fearing that the dog would be hit. After Mr. Vigil departed, Ms. Honce continued shouting and threw the stepping stones into the street. Mr. Vigil then called the animal control department regarding her loose dog. That night, Ms. Honce went to the sheriff's department for advice and was told that she should be concerned for her safety. She left the next day and moved the trailer out on November 11.

[†] The Honorable Timothy D. Leonard, United States District Judge for the Western District of Oklahoma, sitting by designation.

Mr. Vigil testified that he believes there is a "conspiracy" against him, led by his former girlfriend and the sheriff's department. Relationships with most of his tenants quickly break down because of this conspiracy, and the problems are often with women. He has evicted between ten and twenty-five tenants in the past, both male and female, including his own nephew.

Ms. Honce's neighbors testified that they had similar problems with Mr. Vigil. Rosa and Russell Haenner stated that he bothered Mrs. Haenner almost daily. They had a dispute over their dog fence, because Mr. Vigil wanted them to use his materials, and an argument over the flagstone walkway, because Mr. Vigil wanted them to use his flagstones. Mr. Vigil also yelled at them and called them names because they didn't attend a Bible study class with him. Mrs. Haenner insisted that they move out. When they informed Mr. Vigil that they were moving, he issued an eviction notice. They left two weeks after Ms. Honce moved in.

Ms. Honce alleges that Mr. Vigil's actions amount to sexual discrimination and harassment, which forced her to leave the trailer park. The district court granted judgment as a matter of law for Mr. Vigil, following the conclusion of Plaintiff's evidence. The court found no disparate treatment in Mr. Vigil's equally poor treatment of all his tenants, and no evidence of sexual harassment. As for constructive eviction, the court found that the sheriff's advice, not her landlord's actions, caused her to vacate.

## Discussion

■ We review de novo the district court's directed verdict. Fed.R.Civ.P. 50(a) provides for entry of judgment as a matter of law when there is an "absence of proof" of material issues, viewing the evidence in a light most favorable to the non-moving party. *Martin v. Unit Rig & Equip. Co.*, 715 F.2d 1434, 1438 (10th Cir.1983). However, a mere scintilla of evidence is insufficient to create a jury question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A directed verdict is appropriate if "there can be but one reasonable conclusion as to the verdict." *Id.*

While the district court may not resolve conflicts in the testimony or weigh the evidence, it may evaluate the evidence at least to the extent of determining whether there is sufficient evidence to support a jury verdict in favor of the Plaintiff. *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1471 (7th Cir.1993) (affirming directed verdict for defendant in discrimination case). Following a directed verdict in a discrimination case, the question for the appellate court is "simply whether the evidence ... was sufficient to justify a reasonable jury in finding discrimination." *Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 174 (8th Cir.1992).

## I. The Fair Housing Act

■ The Fair Housing Act prohibits gender-based discrimination in the rental of a dwelling, or in the provision of services in connection with a rental. 42 U.S.C. § 3604(b). Discrimination may occur either by treating one gender less favorably (disparate treatment) or by sexual harassment. This circuit has not yet addressed the issue of sexual discrimination in the context of fair housing under Title VIII. However, we will look to employment discrimination cases for guidance. *Morgan v. HUD*, 985 F.2d 1451, 1456 n. 4 (10th Cir.1993); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2nd Cir.), *aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988).

### A. Disparate Treatment

■ The district court determined that there was insufficient evidence of disparate treatment because Mr. Vigil was "equally nasty" to all of his tenants. Ms. Honce argues that Mr. Vigil was more hostile to women, pointing to the evidence of his past problems with women and the supposed "conspiracy" against him by law enforcement. She further argues that Mr. Vigil's testimony of a "conspiracy" at least creates a triable question of fact.

The ultimate question in a disparate treatment case is whether the defendant intentionally discriminated against plaintiff. *St. Mary's v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Sorensen v. City of Aurora*, 984 F.2d 349, 352 (10th Cir.

1993). To survive a directed verdict, plaintiff must establish a prima facie case of discrimination. *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). In the context of employment discrimination, a prima facie case requires proof that the employer, after rejecting plaintiff's application, continued to seek applicants with qualifications similar to plaintiff's. *Id.* Here, the landlord did not refuse to rent to Ms. Honce, nor did he actually evict her. *See e.g. United States v. Reece,* 457 F.Supp. 43, 48 (D.Mont.1978) (landlord refused to rent to female tenants). Ms. Honce offers no evidence of a discrepancy in services provided. The landlord offered the same materials for property improvements to Ms. Honce as to her neighbors, and insisted on compliance with the rental agreement. The fact that Mr. Vigil believed that there was a conspiracy against him is not actionable unless he refused to rent to women or to provide women with the same rental services as men. Such was not the case. The Plaintiff has failed to prove a prima facie case of disparate treatment.[1]

### B. Sexual Harassment

 Harassment based on sex is a form of discrimination. *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987) (addressing harassment in the workplace). We have previously recognized two distinct categories of sexual harassment: "quid pro quo" harassment and hostile work environment (or housing environment) harassment. *Id.* "Quid pro quo" harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors. *See id.* at 1414. Ms. Honce admits that Mr. Vigil did not make any sexual requests, explicit or otherwise, that he acted "gentlemanly" during their conversations, and that he even said he just wanted to be friends. She argues, however, that he became unreasonable after she rejected his advances, which forced her to leave.

Few courts have addressed sexual harassment in the context of fair housing. In *Shellhammer v. Lewallen,* Fair Housing—Fair Lending Rptr. (P–H) ¶ 15,472 at 16,127 (W.D.Ohio), *aff'd,* 770 F.2d 167 (6th Cir.1985), the landlord requested that Mrs. Shellhammer pose for nude pictures, and she refused. One month later he offered her money for sex, which she also rejected. Three months later the landlord evicted her. The district court found that the eviction was in response to the tenant's rejection and awarded damages. (The court rejected plaintiff's hostile housing environment claim, however.) *See also Grieger v. Sheets,* No. 87–C–6567, 1989 WL 38707 (N.D.Ill.1989) ("quid pro quo" claim survived summary judgment where landlord refused to make repairs after tenant rejected his explicit demands for sex).

In *Hicks v. Gates,* plaintiff complained of receiving sexual remarks and inappropriate touching in the workplace. We found no quid pro quo harassment because there was no evidence that job security was conditioned on granting sexual favors. 833 F.2d at 1414. Likewise, Mr. Vigil made no quid pro quo threat based on sexual favors. Ms. Honce contends, though, that the threat was implicit, and that the landlord's subsequent actions were in direct response to her rejection. She failed to provide any evidence of a connection, however. She rejected her landlord's advances prior to moving in to the park. Mr. Vigil did not "retaliate" for the rejection by attempting to stop her from moving in. The disputes which occurred after she moved in involved the plumbing, stepping stones, and dog fence. Mr. Vigil's positions were justifiable: he would only pay for his part of the

---

1. Even assuming that Ms. Honce had met a prima facie case with sufficient evidence of constructive eviction, she would then be required to show proof of pretext if the defendant offers a legitimate, nondiscriminatory reason for the eviction. *E.E.O.C. v. Flasher Co.,* 986 F.2d 1312, 1316 (10th Cir.1992). Defendant presented evidence that the fence and Plaintiff's failure to give notice of construction were in violation of the rental agreement; therefore, Defendant's quarrel regarding the fence was justified. Ms. Honce did not dispute that the fence was in violation of the agreement. In fact her neighbors, a married couple, were evicted (after giving notice) following a similar dispute over fencing and stepping stones, and Mr. Vigil had evicted numerous other tenants of both sexes. So, even assuming a prima facie case of disparate treatment, Ms. Honce lacked evidence of pretext and cannot withstand a directed verdict. *See Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033 (10th Cir.1993).

sewer line, and the fence violated the rental agreement by the use of cement, and Plaintiff's failure to give prior notice. *See Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982) (no causal connection between protected activity and plaintiff's firing where firing was based on legitimate business reason).

 Although Defendant may not be the most rational actor, Title VIII does not make irrational rental policies illegal. *See Flasher,* 986 F.2d at 1319. Ms. Honce failed to present evidence of a causal connection, and a conclusional allegation is insufficient to create a question of fact. *See 1488, Inc. v. Philsec Inv. Corp.,* 939 F.2d 1281, 1289 (5th Cir.1991). We agree that no reasonable jury could find quid pro quo harassment here.

### C. Hostile Housing Environment

 Ms. Honce raises the related claim that Mr. Vigil's harassment created a hostile housing environment. In the employment context an employer violates Title VII by creating a discriminatory work environment, even if the employee loses no tangible job benefits, because the harassment is a barrier to equality in the workplace. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (employer forcing plaintiff to engage in sex in the workplace created hostile environment). Applied to housing, a claim is actionable when the offensive behavior unreasonably interferes with use and enjoyment of the premises. The harassment must be "sufficiently severe or pervasive" to alter the conditions of the housing arrangement. *See Hicks,* 833 F.2d at 1413. It is not sufficient if the harassment is isolated or trivial. *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. at 2404. "'[C]asual or isolated manifestations of a discriminatory environment ... may not raise a cause of action.'" *Hicks,* 833 F.2d at 1414 (quoting *Bundy v. Jackson,* 641 F.2d 934, 943 n. 9 (D.C.Cir.1981)). The offensive acts need not be purely sexual; it is sufficient that they would not have happened but for claimant's gender. *Hicks,* 833 F.2d at 1415. Evidence of harassment of other fe-

male tenants is relevant to plaintiff's claim. *See id.*

In *Hicks,* we remanded for a determination of whether sexual touching, sexual remarks and threats of violence in the workplace constituted a hostile environment. *Hicks,* 833 F.2d at 1415. Hostile environment claims usually involve a long-lasting pattern of highly offensive behavior. *See e.g. Bundy v. Jackson,* 641 F.2d 934. In *Shellhammer,* the Sixth Circuit affirmed a district court finding that two explicit sexual propositions from a landlord during four months of tenancy did not prove a hostile housing environment because it did not create a "burdensome situation" that would make the tenancy undesirable. *Shellhammer v. Lewallen,* No. 84–3573, slip op. at 2, 1985 WL 13505 (6th Cir. July 31, 1985). One survey of sexual harassment in housing cites examples of harassment as making sexual remarks to a tenant, requesting sexual favors, and using the pass key to observe the tenant showering. *See* Regina Cahan, Comment, *Home is No Haven: An Analysis of Sexual Harassment in Housing,* 1987 Wis.L.Rev. 1061, 1062; *see also Grieger v. Sheets,* No. 87 C 6567, 1989 WL 38707 (N.D.Ill. Apr. 10, 1989) (landlord threatened to shoot tenant because tenant rejected sexual advances).

 The offensive behavior here did not include sexual remarks or requests, physical touching, or threats of violence. Mr. Vigil asked Ms. Honce to accompany him socially on three occasions, all prior to her occupying the premises. The contact between them after that involved arguments over plumbing, stepping stones and a fence. The landlord's behavior here was eccentric, and probably unwarranted, but was not directed solely at Ms. Honce. Other tenants of both sexes endured similar treatment. Because the conduct was neither sexual nor directed solely at women, it is not actionable under the hostile housing environment theory. *See Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777 (1st Cir.1990); *Scott v. Sears, Roebuck and Co.,* 798 F.2d 210 (7th Cir.1986).

### II. The Covenant of Quiet Enjoyment

 To sustain a claim of violation of the covenant of quiet enjoyment, a tenant must show actual or constructive eviction.

*El Paso Natural Gas Co. v. Kysar Ins. Agency,* 98 N.M. 86, 87, 645 P.2d 442, 443 (1982). Constructive eviction occurs when the landlord has substantially deprived the tenant of the beneficial use of the premises, and the tenant vacates, *Dennison v. Marlowe,* 106 N.M. 433, 437, 744 P.2d 906, 910 (1987), or when the landlord's actions are meritless, done in malice or bad faith, and so severe as to interfere with the tenant's peaceful enjoyment of the premises. *El Paso Natural Gas Co.,* 645 P.2d at 444.

 The New Mexico Supreme Court has found that three threatening demand letters by the landlord followed by a lawsuit were not sufficient to interfere with the tenant's peaceful enjoyment of the premises. *El Paso Natural Gas Co.,* 645 P.2d at 444. However, the court did find constructive eviction where the tenant was forced out of the premises because of a fire code violation. *Dennison,* 744 P.2d at 910. Other courts have held that mere threats by the landlord do not constitute constructive eviction, *see United States v. Bedford Assoc.,* 548 F.Supp. 732, 740–41 (S.D.N.Y.1982) (threat to condemn building and terminate services), *aff'd in relevant part,* 713 F.2d 895 (2d Cir.1983), nor do acts which merely inconvenience the tenant. *See Baley & Selover, Inc. v. All Am. Van & Storage, Inc.,* 97 Nev. 370, 371, 632 P.2d 723, 724 (1981).

 Mr. Vigil did not take steps to evict Ms. Honce prior to her moving out. Ms. Honce claims that she was frightened by Vigil's erratic behavior and moved out for her safety. Her own testimony, though, was that she moved out after speaking with the sheriff's department and reviewing their files. Past acts of the landlord toward others are not relevant to the current question of whether the landlord acted maliciously toward the plaintiff-tenant. *See El Paso Natural Gas Co.,* 645 P.2d at 444 (question of constructive eviction focuses on malicious acts of landlord aimed at ousting a tenant in rightful possession). The relevant acts are Mr. Vigil's treatment of the fence situation, the plumbing problem, and his apparent threat to the dog. His response to the plumbing problem was, appropriately, that he would only pay for his portion of the line.

As for the fence, he chased off the laborers because the fence was being built with concrete and without prior notice to him, in violation of park policy. His actions were not entirely unjustified, even if erratic. The alleged threat, consisting of returning to his vehicle and "revving" the engine when the dog ran in front of him, is insufficient to create a jury question of constructive eviction. *See Bedford Assoc.,* 548 F.Supp. at 740–41.

Furthermore, even assuming that Defendant's actions amounted to an interference with the property, the interference was limited to a brief period of time on a single occasion. (The primary dispute between the two parties here lasted for less than one hour.). This does not amount to a material disturbance of possession. *See Santillanes v. Property Management Serv.,* 110 Idaho 588, 593, 716 P.2d 1360, 1365 (1986) (locking tenant out of premises for one hour does not materially disturb possession). A reasonable jury could not have found Mr. Vigil's actions sufficiently severe and unjustified so as to deprive Ms. Honce of peaceful enjoyment of the premises.

AFFIRMED.

SEYMOUR, Circuit Judge, dissenting.

I must respectfully dissent from the majority's affirmance of the directed verdict in this case. My examination of the record reveals that, under the standards governing review of directed verdict rulings, Ms. Honce offered sufficient evidence to raise a jury issue on each of her claims. In holding to the contrary, the district court erroneously refused to admit relevant evidence and misperceived the relevance of critical evidence that was admitted. In affirming, the majority selectively and improperly views the record in the light most favorable to Mr. Vigil. In so doing, it both relies on evidence that is irrelevant and disregards relevant evidence supporting Ms. Honce's claims. Moreover, the majority proceeds under an inaccurate view of the applicable law. Although it articulates the proper test, it appears to evaluate the sexual harassment evidence under a crabbed definition that has been specifically rejected by this court.

My disagreement with the majority begins with my belief that it has not reviewed the record under the standards governing consideration of a motion for directed verdict.

Fed.R.Civ. 50(a), which provides for a motion for a directed verdict, is intended to remove from the jury a case where there is either a "complete absence of proof of an issue or issues material to the cause of action" or where "there are no controverted issues of fact upon which reasonable men could differ." 5A Moore's Federal Practice ¶ 50.02[1], at 50–20 (2d ed. 1982). To ensure that the court's exercise of discretion does not improperly invade the province of the jury, the court's discretion to grant a motion for directed verdict is limited in several respects. Most importantly, the court must view the evidence in the light most favorable to the non-moving party. *Wylie v. Ford Motor Company*, 502 F.2d 1292, 1294 (10th Cir. 1974). Further, the opposing party must be given the "benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *New Mexico Savings & Loan Ass'n v. United States Fidelity and Guaranty Co.*, 454 F.2d 328, 331 (10th Cir.1972). Moreover, the court is not permitted to consider the credibility of witnesses in reaching its decision, *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479–80 [64 S.Ct. 232, 234–35, 88 L.Ed. 239] (1943); Wright & Miller, Federal Practice and Procedure § 2527, at 560 (1971), nor may a court weigh the evidence or determine where the preponderance of the evidence lies. *Wylie v. Ford Motor Company, supra*, 502 F.2d at 1294. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700–01 [82 S.Ct. 1404, 1411–12, 8 L.Ed.2d 777] (1962) (jury weighs contradictory evidence and inferences, draws ultimate conclusion as to facts).

In short, only where "the evidence points all one way", *Wylie v. Ford Motor Company, supra*, 502 F.2d at 1294, is a directed verdict appropriate. If there is conflicting evidence or insufficient evidence to warrant a one-way conclusion, a directed verdict is inappropriate. 5A Moore's Federal Practice ¶ 50.02[1], *supra*, at 50–

25 to –27. Generally, we have indicated that directed verdicts "should be cautiously and sparingly granted." *Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d 946, 951 (10th Cir.1978) (quoting *Wilkin v. Sunbeam Corp.*, 377 F.2d 344, 347 (10th Cir.1967)). *Martin v. Unit Rig & Equip. Co.*, 715 F.2d 1434, 1438 (10th Cir.1983).

### I.

I agree with the majority that our assessment of discrimination claims under the Fair Housing Act, 42 U.S.C. § 3604(b), is guided by cases addressing employment discrimination under Title VII. However, I cannot agree with the majority's application of that law to this record.

### A.

I turn first to the issue of disparate treatment. To raise a jury issue on this claim, Ms. Honce was required to present evidence from which the jury could reasonably infer that Mr. Vigil, as a landlord, treated tenants who were women more harshly than tenants who were men. Although the majority refers to the testimony of Mr. and Mrs. Haenner, it fails to draw the inference from their evidence that is most favorable to Ms. Honce or to recognize that this favorable inference supports Ms. Honce's assertion of disparate treatment. Mr. and Mrs. Haenner both testified that Mr. Vigil harassed Mrs. Haenner almost daily about tenancy matters while refusing to deal with Mr. Haenner on these problems even when both Mr. and Mrs. Haenner asked him to do so. Aplt.App. at 342–43, 354, 359. Mrs. Haenner told her husband the situation was so unbearable that she was moving out of the trailer park with or without him. *Id.* at 360. Mr. Haenner refused to leave until he was given this ultimatum. *Id.* This evidence supports a reasonable inference that Mr. Vigil's conduct was selectively directed to women rather than men and amounted to constructive eviction.

Moreover, Mr. Vigil himself testified that the problems he had as a landlord primarily involved tenants who were women. The court specifically asked Mr. Vigil: "Do you

have the same problem with males in your mobile home subdivision as you do the females?" *Id.* at 271. Mr. Vigil responded:

On the accusations, normally they've been with the women. It's a routine situation. Somebody gets evicted the plan is to go make a report at the police station and include sex. But they're not bright enough to even come up with it themselves. I'm the one that told them years ago that that's what I'm going to be accused of, that someday I was going to be sitting in a court because they can't get to me through money, through law. The only way they can get to me is through false sexual allegations.

*Id.* at 271–72. Apparently, Mr. Vigil believed that women tenants were constantly attempting to take advantage of him and his money using sex. Mr. Vigil also believed that at least some of the female tenants with whom he had problems, and Ms. Honce in particular, were dupes of a conspiracy against him by police and sheriff personnel. *See id.* at 297. Mr. Vigil believed that these women were instructed to make false sexual accusations against him by these conspirators. *See* id. at 271–73. This evidence also supports an inference that Mr. Vigil was selectively hostile to women.

The majority simply fails to address the weight we must give this evidence when reviewing a directed verdict ruling. Instead, it begins by adopting the trial court's "finding" that Mr. Vigil was equally nasty to all of his tenants. *See* maj. op. at 1088. The court may not, of course, usurp the jury's role and make fact findings on disputed evidence in directing a verdict. Moreover, the evidence I have set out above supports the inference that Mr. Vigil was abusive only to women and that this abuse rose to the level of constructive or actual eviction.

Next the majority holds dispositive its conclusion that Ms. Honce failed to make a prima facie case. However, the majority supports its conclusion with an improper recitation of the record. Thus it concludes that Mr. Vigil treated both sexes equally harshly because he evicted the Haenners after disputes over tenancy matters similar to those he had with Ms. Honce. Mr. Haenner testi-

fied, however, that Mr. Vigil did not serve an eviction notice on the Haenners until *after* Mr. Haenner had informed Mr. Vigil, at his wife's insistence, that they were moving out. Aplt.App. at 364. The majority also concludes that Mr. Vigil was equally nasty to men and women because he provided the same rental services to both sexes. In so doing, the majority again disregards the standards under which we must view the record in reviewing a directed verdict ruling. We are not at liberty to reweigh conflicting evidence and substitute our judgment for that of the jury. "Further, the opposing party must be given the 'benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn.'" *Martin*, 715 F.2d at 1438 (quoting *New Mexico Sav. & Loan Ass'n v. United States Fidelity & Guaranty Co.*, 454 F.2d 328, 331 (10th Cir.1972)). Thus, assuming that an inference favorable to Mr. Vigil might be drawn from his provision of equal rental services to men and women, this inference is not dispositive when, as here, an inference favorable to Ms. Honce can be drawn from evidence that Mr. Vigil's differing treatment of men and women when providing those rental services resulted in the constructive eviction of women. This same evidence also supports an inference that Mr. Vigil's "justification" for his actions, *see* maj. op. at 1089 n. 1, is mere pretext to discriminate against women. Thus, the evidence, and the reasonable inferences drawn therefrom, supports a finding of disparate treatment.

### B.

The majority also concludes that a directed verdict was proper on Ms. Honce's claim of quid pro quo sexual harassment. Again I must disagree. The majority improperly bases its conclusion on a view of the record that favors Mr. Vigil. Ms. Honce's quid pro quo claim required her to present evidence that Mr. Vigil conditioned the quality of her home environment upon her positive response to his personal overtures. The majority concludes that Ms. Honce failed to establish any connection between her refusals to go out with Mr. Vigil and his com-

mencement of abusive behavior toward her. In support of this conclusion, the majority states that Ms. Honce rejected Mr. Vigil's advances before she moved in and that Mr. Vigil did not attempt to stop her from moving in.[1] However, Mr. Vigil's own testimony undercuts the majority's characterization of the situation. Ms. Honce moved the trailer into the park in mid-September and then began moving her belongings in piecemeal after that. Although she did not physically move into the trailer herself until October 1, she had signed a rental agreement in August. Mr. Vigil testified that in his view Ms. Honce had possession upon signing the rental agreement on August 25. He stated that after she signed the agreement, "[N]obody else could have lived there. The minute I sign, no one can live—I had given her possession. It's immaterial when she decides to move in. And it's immaterial when the mobile home moves in." Aplt.App. at 278–79. Moreover, Mr. Vigil testified that he and Ms. Honce "had a very, very good relationship up until about a week *after* she moved in." *Id.* at 292 (emphasis added). The majority seemingly believes that a single mother of a young child who has just borrowed money to buy a mobile home and has signed a rental agreement for the lot onto which she has moved it somehow is completely free to abandon the lease and leave the premises upon finding the conduct of her new landlord offensive. This inference, adversely drawn by the majority against Ms. Honce, is belied by Mr. Vigil's insistent testimony that Ms. Honce was in severe financial straits, and by the fact that she ultimately was required to borrow $1,000 from her parents to pay the cost of moving the mobile home. It also defies common sense regarding the economic realities of single working mothers such as Ms. Honce.

In view of our obligation to view the record most favorably to the nonmoving party and to give her the benefit of all reasonable infer-

ences to be drawn from the evidence, in my judgment the record raises a jury issue on whether Mr. Vigil retaliated against Ms. Honce because she refused to go out with him. Ms. Honce testified that Mr. Vigil's attitude toward her changed abruptly after she made it clear to him at the very end of September that she did not wish to see him socially. *See id.* at 84–86. She testified that when she next spoke to Mr. Vigil to discuss a plumbing problem and her dog run, he became very upset and hung up the phone. Their relationship continued to deteriorate until the October 24 encounter witnessed by the fence installers at which Mr. Vigil threatened to evict her. *See infra* at 1096–1097. In the context of retaliation under Title VII, we have held that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected *conduct closely followed by adverse action.*" *Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.) (emphasis added), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). I believe the jury could reasonably infer from the circumstances here that Mr. Vigil's conduct, culminating in his eviction threat, was in retaliation for her refusal of his invitations.

## C.

Finally, I am particularly troubled by the majority's treatment of Ms. Honce's claim that she was the victim of a discriminatory hostile housing environment. This circuit's law with respect to hostile environment claims is set out in *Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987), in which we adopted the District of Columbia Court of Appeals' definition of sexual harassment.

"We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of an employee

---

1. In order to make out a quid pro quo claim, Ms. Honce does not need to prove that she was denied the opportunity to move in. A quid pro quo claim may be established by showing that "tangible [housing] benefits are conditioned on [a lessee's] submission to conduct of a sexual nature and that adverse [housing] consequences result from the [lessee's] refusal to submit to the conduct." *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1414 (10th Cir.1987). In an employment context, we did not require the plaintiff in *Hicks* to prove that she was fired. Rather, a loss of job benefits due to a refusal to submit to sexual advances was enough. *Id.* Thus, a denial of rental services alone is enough to make a case for quid pro quo sexual harassment.

must, to be illegal under Title VII, take the form of sexual advances or of other instances with clearly sexual overtones. And we decline to do so now. Rather, we hold that *any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee* or employees may, if sufficiently patterned or pervasive, comprises an illegal condition of employment under Title VII."

*Id.* at 1415 (emphasis added) (quoting *McKinney v. Dole*, 765 F.2d 1129, 1138–39 (D.C.Cir.1985)); *see also Hall v. Gus Construction Co.*, 842 F.2d 1010 (8th Cir.1988) (predicate acts underlying a sexual harassment claim need not be clearly sexual in nature); *Robson v. Eva's Super Market, Inc.*, 538 F.Supp. 857 (N.D.Ohio 1982) (assignment of more onerous tasks to female employee after employee resisted supervisor's advances is sufficient evidence of sexual harassment to withstand summary judgment); *Grieger v. Sheets*, 1989 WL 38707 (N.D.Ill. April 10, 1989) (conduct of nonsexual nature can support a sexual harassment claim). We also note that "the requirement for repeated exposure will vary inversely with the severity of the offensiveness of the incidents." *Vermett v. Hough*, 627 F.Supp. 587 (W.D.Mich. 1986) (collecting cases). *See also Henson v.*

*City of Dundee*, 682 F.2d 897, 904 n. 8 (11th Cir.1982).

The majority's review of the evidence supports my conclusion that it has again viewed the evidence most favorably to Mr. Vigil. The majority states that "[t]he offensive behavior here did not include sexual remarks or requests, physical touching, or threats of violence."[2] Maj. op. at 1090. It then concludes there is no evidence of disparate treatment because Mr. Vigil treated women the same as men. *Id.* Finally, it states that "[b]ecause the conduct was neither sexual nor directed solely at women, it is not actionable under the hostile housing environment theory." *Id.*

The fact that Mr. Vigil's conduct was not sexual in nature is irrelevant under *Hicks* so long as that conduct would not have occurred but for Ms. Honce's gender. Moreover, when the record is evaluated under a standard that gives effect to our holding in *Hicks*, the evidence I have set out in discussing the disparate treatment claim indisputably supports the inference that Mr. Vigil's conduct created a hostile environment for women. This evidence indicates that numerous women, including Ms. Honce, Mrs. Haenner, and others to whom Mr. Vigil himself referred, had felt compelled to move out as a result of Mr. Vigil's behavior or had been evicted by him.[3] The majority's statement

---

**2.** I must take issue with the majority's assertion that Mr. Vigil's offensive behavior did not include "threats of violence." Maj. op. at 1090. Ms. Honce described one incident which a jury could easily view as a threat of violence.

> And at that point, he just was—his whole manner was just real looming, you know, like he was just—just, to me it was threatening that he was just coming in there and trying to intimidate me. And then he—you know, he just told the man, "Stop your work. Pack up and leave. She's not getting this fence."
>
> And he got in his truck. And at that point my dog is still standing there and happened to be, like, standing right in front of his truck. And he got in his truck. And, like, just from the look on his face and the fact that he was, like, revving his engine, getting ready to go, I knew—I knew that if I didn't step in and get my dog, he was just going to run over my dog.

Aplt.App. at 115–16. The police officer with whom Ms. Honce spoke described further incidents of violence. "She claimed that he was insisting that she went out with him, and when she refused, he was coming to the house at all hours of the night and banging on her door,

screaming at her obscenities and all types of abusive language; and, therefore, she was very frightened of him." *Id.* at 337.

**3.** The district court clearly erred in refusing to admit Ms. Honce's proffered evidence showing Mr. Vigil's treatment of other women tenants. Over Ms. Honce's objection, the trial court stated several different times that this evidence was not relevant to Ms. Honce's claim. *See* Aplt.App. at 244, 248–49, 251, 253, 257–58, 262. This court, however, has specifically held to the contrary. In *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415, 1416 (10th Cir.1987), we said that "incidents of sexual harassment directed at employees other than the plaintiff can be used as proof of the plaintiff's claim of a hostile work environment." We pointed out that because the environment "is an important factor in evaluating the claim," such evidence could be critical. *Id.* Accordingly, we stated that evidence tending to show a defendant's harassment of other women in the plaintiff's situation "is directly relevant to the question whether he created an environment violative of Title VII." *Id.* at 1416 (citation omitted).

that "tenants of both sexes endured similar treatment" from Mr. Vigil, *id.*, is simply without evidentiary support. The record contains specific references to only two male tenants, Mr. Haenner and Mr. Vigil's nephew. As set out above, Mr. Vigil did not direct any hostile behavior to Mr. Haenner. Although Mr. Vigil was attempting to evict his nephew, the record does not reveal the details of Mr. Vigil's conduct toward the nephew during this proceeding. In sum, the majority simply fails to recognize that a landlord may violate the Fair Housing Act even when he does provide equal rental services if, in so doing, he creates a hostile environment for women. Because I believe Ms. Honce has raised a jury question with respect to her Fair Housing Act claims, I would reverse the grant of a directed verdict.

## II.

I do not disagree with the majority's discussion of the general law on the covenant of quiet enjoyment but rather with the application of that law to the facts. The covenant of quiet enjoyment gives the lessee "the quiet and peaceable possession and enjoyment of the leased premises." 49 *Am.Jur.2d Landlord and Tenant*, § 330 at 344 (1970). "It has been stated that a landlord is under the implied obligation not to disturb or in any way interfere with the leased premises of the tenant's use and occupancy thereof ..." *Id.* § 336 at 351. Where there is interference with this covenant that is attributable to the landlord, the tenant has been constructively evicted. "[T]he concept is that, because of some wrongful act or omission by the landlord, the premises become uninhabitable ('untenantable') for the intended purposes." Roger A. Cunningham, William B. Stoebuck, Dale A. Whitman, *The Law of Property* § 6.33 at 296 (1984). The test for constructive eviction can be stated as " 'Should a tenant be expected to continue to occupy the premises under these conditions?' " *Id.* at 297.

During her testimony, Ms. Honce stated on numerous occasions that Mr. Vigil's actions caused her to fear for her own safety and that of her young son. Aplt.App. at 128, 130, 135–137. She went to the police to ask for help and *was advised by the police to move.* *Id.* at 331–332. Captain Crespin of the Sandoval County Sheriff's Department told Ms. Honce "it would be for her best interests to leave that place as soon as possible," *id.* at 331, "because she was probably in danger for herself and her child," *id.* at 332. Ms. Honce's version of the same encounter reveals that Captain Crespin did not casually suggest that she leave her home:

Q. What did Captain Crespin do?

A. He showed me a file that he had in his file cabinet.

Q. And did you look at that file?

A. Yes.

Q. Did you read it over?

A. Yes. The portion that he showed me, yes.

Q. He gave you one particular file?

A. Yes. He gave me a report—one report out of the file.

Q. And you read it over?

A. Yes.

Q. What was your reaction to reading the report?

A. I became very concerned for my safety and the safety also of my child, but just concerned to the point that I became very afraid. I felt that I had come very close to having something violent happen to me, and I was—my feeling at that time was just to try to get out of that trailer park as fast as I could.

*Id.* at 128–29.

After her discussion with the police, she returned home where she spent the night awake and afraid. "Well, I was just very afraid. I didn't—I just really didn't sleep. I loaded my gun, and I sat up—I put my son to bed and I sat up and basically watched TV all night." *Id.* at 130. During the following two weeks, Ms. Honce stayed with friends as much as possible. *Id.* at 132–134. She only returned to the trailer when it was a necessity, and then she kept a loaded gun beside her. *Id.* at 132, 135. When Ms. Honce was able to make arrangements to move her trailer, a police officer came to the trailer park "to see that there was no problem." *Id.* at 333. The testimony of Captain Crespin and

Ms. Honce raises the inference that the conditions under which Ms. Honce was living, due to Mr. Vigil's actions, were such that she was constructively evicted.

Ms. Honce also testified that Mr. Vigil threatened to evict her. On October 24, 1990, she was having a fence built so that she could have a dog run as required by Mr. Vigil. Mr. Vigil arrived at her home while the fence was being put in and proceeded to stop the workers because they were using concrete. Ms. Honce asked Mr. Vigil what was going on and he responded, "Well, I'll just evict you, then. I'll just evict you." *Id.* at 115. Bruce Wheeler, the owner of the fence company, was present during the above exchange. His testimony corroborated Ms. Honce's testimony that Mr. Vigil threatened to evict her. He testified that Mr. Vigil said to Ms. Honce, " 'You'll be receiving your eviction notice.' That's what I heard." *Id.* at 372. Mr. Vigil himself admitted that he may have said that. *Id.* at 277.

Mr. Wheeler also described the abusive nature of Mr. Vigil's conduct, stating that "[i]t was very unusual. There's only been another incident in the whole 14 years that I've done fence work that something of this magnitude has happened, you know, neighbors or owner and landlord, things like that." Aplt.App. at 370. He said that Mr. Vigil "started really raising his voice" to Ms. Honce, *id.* at 372, and that "[i]t just surprised the hell out of me. Things like that just don't happen every day. To me, he didn't handle the situation professionally. There were other ways he could have handled it in a more humane manner than the way he did." *Id.* Finally, Mr. Wheeler testified that he told his helper that "if somebody ever talked to me or he came over and talked to me the way he was talking to Ms. Honce, I'd bust his ass." *Id.* at 374.

Ms. Honce contends that she was constructively evicted by Mr. Vigil's actions which caused her to fear for her safety. When we give Ms. Honce the benefit of all of the evidence and inferences, as we must, there is ample evidence to suggest an interference with her property. When a landlord causes a tenant to fear for her safety to the point where she seeks other quarters and keeps a loaded gun by her side, I believe there is, *at least,* a jury question regarding constructive eviction. It is for the jury to determine if her fear is reasonable and justified.

The cases cited by the majority do not require that we affirm the district court. The case before us does not involve simple demand letters for eviction, *El Paso Natural Gas Co. v. Kysar Ins. Agency, Inc.,* 98 N.M. 86, 645 P.2d 442 (1982), threats to terminate services, *United States v. Bedford Assoc.,* 548 F.Supp. 732 (S.D.N.Y.1982), or mere inconveniences to the tenant, *Baley & Selover, Inc. v. All Am. Van & Storage, Inc.,* 97 Nev. 370, 632 P.2d 723 (1981). This case involves extremely bizarre behavior on the part of the landlord, coupled with police reports regarding him, which caused the tenant to fear for her safety.[4] The majority notes that Mr. Vigil's "actions were not entirely unjustified, even if erratic." Maj. op. at 1091. However, Mr. Vigil's "justification" is not the issue. Rather, the issue is whether his actions interfered with Ms. Honce's right to enjoyment of her property.

Finally, the majority contends that the interference with property was "limited to a brief period of time on a single occasion." Maj. op. at 1091. The majority relies on *Santillanes v. Property Management Servs., Inc.,* 110 Idaho 588, 716 P.2d 1360 (App. 1986). There the evidence, which was submitted to the factfinder, demonstrated that the tenant was locked out of his business for one hour prior to opening. *Id.* at 590, 716 P.2d at 1362. Here the interference lasted two weeks and ultimately drove Ms. Honce away. Aplt.App. at 134. Moreover, it involved threatening conduct by the landlord corroborated by police reports of prior conduct. Surely the majority does not believe a tenant must wait for actual physical violence before a claim for breach of her right to quiet enjoyment of the property arises. Nothing in the New Mexico cases on the covenant of quiet enjoyment persuades me that state law

---

**4.** I am puzzled by the majority's reference to *El Paso Natural Gas Co.,* 645 P.2d at 444, *see* maj. op. at 1091, because I find no support in that case for the proposition that past acts of the landlord toward others are not relevant.

would require as much. I believe a reasonable jury could find that Mr. Vigil's actions were sufficiently severe and unjustified so as to deprive Ms. Honce of peaceful enjoyment of the premises. I would therefore reverse the district court's directed verdict on the constructive eviction issue as well.