Bobbi Jean WILKERSON, Plaintiff,

v.

P.I.A. TOPEKA, INC., aka Psychiatric Institutes of America dba Parkview Hospital, Ty A. Hill, an individual, Defendants.

No. 94–4054–SAC.

United States District Court,
D. Kansas.

July 28, 1995.

Stephen W. Cavanaugh, Fisher, Cavanaugh & Smith, P.A., Topeka, KS, Joyce E. Haile Selassie, Lawrence, KS, for Bobbi Jean Wilkerson.

Toni H. Blackwood, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, for N.M.E. Psychiatric Hospitals, Inc. and Ty A. Hill.

Toni H. Blackwood, Brian J. McGrath, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, for P.I.A. Topeka, Inc.

## MEMORANDUM AND ORDER

CROW, District Judge.

Bobbi Jean Wilkerson was hired as a housekeeper by P.I.A. Topeka, Inc., aka Psychiatric Institutes of America, dba Parkview Hospital ("Parkview Hospital"). Wilkerson claims that throughout her employment at Parkview Hospital, she was constantly sexually harassed by her supervisor, Ty Hill. Wilkerson asserts claims under Title VII as well as a supplemental claim for intentional infliction of emotional distress. Wilkerson seeks damages in the amount of $302,704.78, representing the sum of back and future pay, medical expenses, loss of consortium on behalf of her husband, and compensatory damages for pain, suffering, mental anguish and punitive damages.

This case comes before the court upon Parkview Hospital's motion for partial summary judgment on the following claims asserted by the plaintiff:

1. Intentional infliction of emotional distress;

2. *Quid pro quo* sexual harassment.

Wilkerson responds, arguing that genuine issues of material fact preclude summary judgment. Parkview Hospital filed a reply.

### Summary Judgment Standards

■ A defending party may move for summary judgment on any or all of the adverse party's claims. *See* Fed.R.Civ.P. 56(b). A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

■ The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

■ If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the nonmoving party's case."). When the nonmoving party will have the burden of proof at trial, "'Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin,* 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 929 (7th Cir.1995); *see Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

■ More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

### Summary of Facts

The following is a summary of the essential facts, viewing the evidence in the light

most favorable to Wilkerson. On January 3, 1991, Wilkerson was hired as a housekeeper by Parkview Hospital. On February 17, 1991, Wilkerson was promoted to Housekeeping Supervisor. Wilkerson's duties as housekeeping supervisor involved many tasks including scheduling, maintaining of records, interviewing and hiring new personnel and assisting in the preparation of the budget. Wilkerson was a very hard worker. Wilkerson received an employee of the month and the employee of the year award for 1992.

Ty Hill was the Director of Facility Operations throughout Wilkerson's employment at Parkview Hospital. The Director of Facility Operations has supervisory responsibility over the housekeeping department. Steve Weir became the Assistant Director of Facility Operations in November 1991. The Assistant Director of Facility Operations has supervisory duties over the Housekeeping Supervisor and reports directly to the Director of Facility Operations. Teresa Markowitz was promoted from Assistant Administrator to Administrator/CEO of Parkview Hospital in early June 1992. Brian Lutz was the Human Resource Director at Parkview Hospital throughout Wilkerson's employment.

Wilkerson contends that Hill made statements and committed acts which she considered to be sexually harassing. The following comprises a summary of the conduct which Wilkerson contends occurred:

(1) While in the cleaning closet with Wilkerson to review the housekeeping work schedule, Hill came up from behind and pressed his body into hers; Wilkerson could feel the grinding of his penis on her buttocks.

(2) Hill required Wilkerson to remove a spot on his pants near his crotch;

(3) On several occasions, Hill made sexually harassing comments to her including: "Does your husband satisfy you in bed?";

"I'm a Texas boy, I got big hands and I got a big dick.";

(4) On one occasion, Hill showed her a photograph of a nude man with an erection;

(5) On one occasion, Hill, who was walking down a hallway with some paperwork in his hand, slapped Wilkerson on the buttocks with the paper and then "hit down over [her] breast." Hill laughed as he walked on down the hall.

Wilkerson was afraid that she would lose her job if she did anything in response to these actions. Wilkerson's fear was based upon statements Hill made on repeated occasions which included: "I'm the hatchet man."; "I love to chop people up and throw them away."; "If he lost his job, everyone was going with him."; and "I did you a favor when I hired you."

Apparently after Wilkerson rejected Hill's sexual advances, her supervisory duties over the housekeeping staff were taken away. In her deposition, Wilkerson stated that Hill undermined her authority over other employees "by telling them that they didn't have to do the job or they didn't have to report to me. And then when the job wouldn't get done [Hill] would come to me and ask me why it wasn't done when he knew why it was not done." Hill changed Wilkerson's work hours, rearranged her work schedule, and told her that her duties would no longer include checking the hospital or assigning work to other employees.[1]

On July 27, 1992, Wilkerson met with Lutz to discuss her concerns about Ty Hill and the diminution of her job duties.[2] Specifically, Wilkerson claims that she informed Lutz that Hill was sexually harassing her and that Hill was systematically demoting her. On July 29, 1992, Wilkerson met with Lutz and Markowitz to again express her concerns about

---

1. The plaintiff's brief indicates that these events occurred after she complained to Parkview Hospital about Hill's harassing actions and comments. Parkview Hospital contests this statement, arguing that the change in Wilkerson's work hours and job responsibilities occurred prior to the time she made any complaint to Parkview Hospital. Having reviewed the portions of Wilkerson's deposition which she cites, it is not clear even from her testimony that the changes in her job occurred *after* she complained to Parkview Hospital about Hill. A fair reading of her deposition, however, suggests it is her testimony that her job duties and hours changed after she rejected Hill's unwanted advances.

2. The first written notice Wilkerson provided to Parkview Hospital concerning her allegations of sexual harassment was dated September 22, 1992.

Hill and her job. On July 30, 1992, Wilkerson met with Hill, Lutz and Weir about her concerns about her job. As a result of that meeting, Wilkerson claims that Markowitz simply told Wilkerson and Hill that they were to have no contact together.

The last day that Wilkerson worked in the Parkview Hospital building was August 25, 1992. Wilkerson remained employed by Parkview Hospital but was apparently on leave until she resigned, effective June 1, 1993.

On October 13, 1992, Lutz interviewed Hill about Wilkerson's allegations of sexual harassment. Hill denied any wrongdoing. Lutz interviewed Weir on October 14, 1992. Weir did not corroborate Wilkerson's allegations of sexual harassment.

Lutz subsequently attempted to contact Wilkerson, who was on leave from Parkview Hospital, to determine the details of her allegations of sexual harassment. On October 19, 1992, Wilkerson's attorney notified Lutz that Wilkerson was not willing to be interviewed concerning her allegations of sexual harassment.

Wilkerson suffered emotional trauma as a result of Hill's harassment. Wilkerson attempted suicide by drug overdose. Wilkerson testified in her deposition that her suicide attempt stemmed from the sexual harassment she had endured from Hill.

### Intentional Infliction of Emotional Distress

Parkview Hospital seeks summary judgment on the plaintiff's intentional infliction of emotional distress claim. Parkview Hospital contends that nothing it did in handling Wilkerson's allegations of sexual harassment are sufficient to impose liability on it for the tort of outrage. Because Wilkerson did not report Hill's conduct to anyone at Parkview Hospital until July 22, 1992, it was unaware that any problem existed. Consequently, Parkview Hospital contends that it cannot be held liable for the tort of outrage as it did not fail to adequately respond to Wilkerson's allegations of sexual harassment as there were none until shortly before the time she quit working.

Parkview Hospital also contends that it cannot be vicariously liable for Hill's conduct, as his acts of sexual harassment were obviously not authorized or done with a view to furthering Parkview Hospital's business. *See Williams v. Community Drive–In Theater, Inc.*, 214 Kan. 359, 520 P.2d 1296 (1974). Instead, Hill's alleged sexual harassment was only to satisfy personal desires and in no way had anything to do with Parkview Hospital's business of providing health care.

Wilkerson responds, arguing that genuine issues of material fact preclude summary judgment. Wilkerson argues that Parkview Hospital's own conduct was so extreme and outrageous that she has presented a prima facie claim for intentional infliction of emotional distress. Wilkerson argues that Parkview Hospital "turned a blind eye to [her] claims of harassment after being notified, and allowed the harassment to continue" until it became so severe that she attempted suicide.

Wilkerson does not argue that Hill's actions were done in furtherance of Parkview Hospital's business. Instead, Wilkerson seeks to impose liability upon Parkview Hospital under Restatement (Second) of Agency § 219(2)(d) (1958), which provides:

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> . . . . .
>
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*See Hirschfeld v. New Mexico Corrections Dept.*, 916 F.2d 572, 576–79 (10th Cir.1990); *Henry v. Gehl Corp.*, 867 F.Supp. 960, 968 (D.Kan.1994). Under § 219(2)(d), Parkview Hospital would potentially be responsible for Hill's actions as "he was aided in accomplishing the tort by the existence of the agency relation."

Parkview Hospital responds, arguing that Kansas has not, nor would it, adopt § 219(2)(d) and that such an agency theory should only be recognized in determining liability under Title VII.

## Elements of the Tort of Outrage

 The Kansas Supreme Court has recognized the tort of outrage or intentional infliction of emotional distress [3] as stated in the Restatement (Second) of Torts § 46(1) (1963). *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 820, 529 P.2d 104 (1974). The tort "is not a favored cause of action under Kansas law." *E.E.O.C. v. General Motors Corp.,* 713 F.Supp. 1394, 1396–97 (D.Kan.1989). "The Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting." *Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990).[4] See *Bolden v. PRC Inc.,* 43 F.3d 545, 554 (10th Cir.1994) ("[Plaintiff] has failed to bring to this court's attention any Kansas tort of outrage case in which an employer was held liable for the outrageous conduct of an employee.").[5]

The Kansas Supreme Court recently discussed the tort of outrage:

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. [Citations omitted.] Proof of four elements is required to establish the cause of action: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

"Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it."

*Taiwo v. Vu,* 249 Kan. 585, 592, 822 P.2d 1024 (1991) (quoting *Roberts,* 230 Kan. at 292–93, 637 P.2d 1175).[6]

The Supreme Court of Kansas went on to discuss the type of conduct that is extreme and outrageous enough to permit recover under the tort of outrage:

"In *Dotson v. McLaughlin,* 216 Kan. [201] at 210 [531 P.2d 1 (1975)], Mr. Justice Prager speaking for the court adopted guidelines from the Restatement of Torts.

3. The torts of outrage and the intentional infliction of emotional distress are interchangeable terms for the same cause of action. *Taiwo v. Vu,* 249 Kan. 585, 586, 822 P.2d 1024 (1991); *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175 (1981).

4. In *Laughinghouse,* the plaintiff was subjected to constant abuse and harassment by her supervisor over a two year period. The harassment and abuse took the form of screaming and cursing, unwanted touchings and sexual comments, fits of rage which included throwing things and tearing up files, and threats of termination. The supervisor treated the plaintiff "like an animal." Although the supervisor was abusive to many people, his treatment of the plaintiff "was unique in its constancy and severity." 754 F.Supp. at 843. Based upon "the nature of the abuse coupled with its constancy," Judge Rogers denied the defendants' motion for summary judgment on the plaintiff's outrage claim. 754 F.Supp. at 844.

5. However, where the outrageous acts are committed by the employer, *see Gomez v. Hug* 7 Kan.App.2d 603, 645 P.2d 916 (1982), or a supervisor, *Laughinghouse,* 754 F.Supp. at 838, 842–844, rather than by coworkers, the plaintiff has survived the defendant employer's summary judgment motion.

6. In *Taiwo,* the plaintiffs filed a civil suit against the defendant alleging assault, battery, false imprisonment and intentional infliction of emotional distress. The dispute in that case did initially rise out of the employee/employer relationship. Specifically, the disagreement between Mrs. Taiwo and Vu concerned Mrs. Taiwo's final paycheck. During an argument about the amount of the final paycheck, the defendant apparently shoved Mrs. Taiwo in the chest and subsequently locked Mrs. Taiwo inside the day-care center. Vu also made false accusations to the police indicating that Mr. Taiwo had vandalized her car. Vu also instructed another employee, Sally Matthies, to tell the police that she observed the Taiwo's vandalism, when in fact she did not witness any acts of vandalism by the Taiwo's. The jury returned a verdict in favor of the plaintiffs in the amount of $20,000 and the trial judge assessed $3,000 in punitive damages. The Supreme Court of Kansas affirmed the judgment of the district court.

It was pointed out that recovery must depend on the facts and circumstances of each case but liability may only be found in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. It was further said liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, 'Outrageous!'

"It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt. Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper. Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society."

249 Kan. at 592–593, 822 P.2d 1024 (quoting *Roberts,* 230 Kan. at 293, 637 P.2d 1175).

In *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982), the plaintiff, an employee, was subjected to a stream of vulgar comments, racial epithets and threats of physical violence by his employer, Hug, a county commissioner. The court of appeals concluded that district court erred in granting summary judgment in favor of Hug:

Certainly there is no occasion for the law to intervene in every case where someone's feelings are hurt. Certainly the rough edges of our society still need smoothing down and there must still be freedom to blow off harmless steam. But this vituperation was well beyond the bounds of freedom to blow off harmless steam. It is not a burden of American citizenship in the State of Kansas that such vitriolic bullying as was turned by Hug against Gomez, and

its emotional and physical consequences, must be accepted without possibility of redress and accepted as often as it amuses the speaker to utter it. Kansas courts are not so impotent. At the very least the victim of such an attack has the right to have his grievance heard by a jury of average members of the community to know whether they would exclaim. "Outrageous!"

7 Kan.App.2d at 610–11, 645 P.2d 916.

### Analysis

◼ Parkview Hospital correctly argues that there is insufficient evidence to impose liability upon it for the tort of outrage under a theory that it failed to act in response to Wilkerson's complaints of sexual harassment. Wilkerson's contention that Parkview Hospital turned a blind eye to her allegations is generally unsupported by the materials cited in her response to Parkview Hospital's motion for partial summary judgment. Nor has Wilkerson demonstrated that Parkview Hospital's acts or omissions in responding to or investigating her allegations of sexual harassments rise to the level of outrageous conduct. See *Braun v. Dillon Companies, Inc.,* No. 94–2079–EEO, 1995 WL 261142, *14–15, 1995 U.S.Dist. LEXIS 6117, at *40–43 (D.Kan. April 19, 1995).

◼ Wilkerson's alternative argument is not so easily dispensed. Neither party cites any Kansas cases specifically addressing the issue of whether or not Kansas has or would adopt § 219(2)(d) under these facts, nor does it appear that this issue has been expressly considered by the Kansas courts. In general, § 219(2)(d) is discussed in the context of Title VII litigation. *Cf. Spencer v. General Elec. Co.,* 894 F.2d 651, 657 (4th Cir.1990) (Title VII liability a much different animal than common law tort liability; court refuses to expand Virginia common law on a theory of liability rooted in Title VII). Whether Kansas' common law would embrace the expanded liability imposed by § 219(2)(d) is therefore unresolved.

As the Tenth Circuit has noted, employees have largely been unsuccessful in their attempts to pin liability for the tort of outrage on an employer based upon the intentional

tortious acts of its agents. However, in disposing of other plaintiff's tort of outrage claims against an employer, virtually none of the cases contains an express discussion of § 219(2)(d). *See, e.g., Parks v. Hayward's Pit, Inc.,* No. 93–2387–JWL, 1993 WL 545231, 1993 U.S.Dist. LEXIS 18529 (D.Kan. Dec. 21, 1993)[7]; *but see Hastings v. Hancock,* 842 F.Supp. 1315 (D.Kan.1993) (defendants' motion for summary judgment on plaintiff's Title IX sexual harassment claims denied as defendants were potentially liable under § 219(2)(d); defendant's motion for summary judgment on plaintiff's intentional infliction of emotional distress claim denied "[f]or the same reasons discussed in the section of this memorandum and order concerning defendants' potential Title IX liability.").

 Presumably this dearth of discussion is due in part to the fact that plaintiff's have generally not raised § 219(2)(d) as a potential means of imposing liability on the employer. Moreover, § 219(2)(d) is only potentially applicable under a limited set of circumstances. By its terms, liability against the employer would only arise under § 219(2)(d) if a person with supervisory authority over the plaintiff was the harasser or tortfeasor. *See Hirschfield.,* 916 F.2d at 576–79. Consequently, liability cannot be imposed under § 219(2)(d) where the tortfeasor did not occupy a supervisory position. See *Braun,* No. 94–2079–EEO, 1995 WL 261142, at *8–9, 1995 U.S.Dist. LEXIS 6117, at *25 (no liability under § 219(2)(d) for employee's sexual harassment of his supervisor).

In any event, the resolution of this issue is saved for another day. Because the court believes that Parkview Hospital's liability for the tort of outrage may be resolved on grounds other than those argued here, *see Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 501 (D.Kan.1994), *motion for reconsideration denied,* No. 93–4188–SAC, 1995 WL 408436, 1995 U.S.Dist. LEXIS 9428 (D.Kan. May 3, 1995); *Thomason v. Pruden-*

*tial Ins. Co. of America,* 866 F.Supp. 1329, 1337–1338 (D.Kan.1994), the court deems it unnecessary at this juncture to delve any further into what appears to be an issue of first impression. Therefore, based upon the arguments presented, the court denies without prejudice Parkview Hospital's motion for partial summary judgment on the basis of no liability under § 219(2)(d).

Parkview Hospital's motion for partial summary judgment on the plaintiff's tort of outrage claims is granted in part and denied in part without prejudice, subject to reconsideration by the court following the court's consideration of the parties' trial briefs. The court anticipates that the parties will fully address all of the relevant remaining issues concerning the plaintiff's claims in their respective trial briefs.[8]

### *Quid Pro Quo* Claim

Parkview Hospital contends that Wilkerson has insufficient evidence to preclude summary judgment on her *quid pro quo* claim. Parkview Hospital contends that there is no evidence or allegation that Hill suggested to Wilkerson—either explicitly or implicitly—that her employment with Parkview Hospital was conditioned on granting sexual favors to him.

Wilkerson responds, arguing that she has presented sufficient evidence to demonstrate the existence of a genuine issue of material fact on her quid pro quo claim. Wilkerson argues that the veiled threats of termination made by Hill, a person with actual authority to fire her, viewed in conjunction with his more explicit requests for sexual favors, demonstrates that summary judgment is not appropriate on this claim.

In its reply brief, Parkview Hospital argues that "[c]ommon sense holds that [Hill's] statements and conduct simply do not amount to sexual advances. They are nothing more than crude acts that may amount to

---

**7.** In *Parks,* No. 93–2387–JWL, 1993 WL 545231, 1993 U.S.Dist. LEXIS 18529, a supervisor allegedly reduced the plaintiff's working hours after he exposed his penis to the plaintiff and the plaintiff refused his request for oral sex. Judge Lungstrum, based upon his determination that the plaintiff failed to plead or proffer that the supervisor was acting either in furtherance of the business or in the execution of his authority,

granted the employer defendant's motion to dismiss. The opinion in *Parks* does not, however, expressly discuss § 219(2)(d).

**8.** In this court, the date for filing trial briefs is set during the status conference, which is typically held a week or two before trial. In this case, trial is set for September 18, 1995; the status conference is set for September 1, 1995.

a sexually hostile working environment, but not *quid pro quo* sexual harassment." Parkview Hospital also argues that common sense "holds that the statements do not amount to threats to fire the plaintiff."

### Legal Framework

■ "Harassment based on sex is a form of discrimination." *Honce v. Vigil,* 1 F.3d 1085, 1089 (10th Cir.1993). The Tenth Circuit has recognized two distinct categories of sexual harassment: *quid pro quo* harassment and hostile work environment harassment. *Id.* (citing *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987)).[9] "To prevail on a quid pro quo discrimination claim, the plaintiff must show that concrete employment benefits were conditioned on submission to sexual conduct." *Martin,* 3 F.3d at 1416; *see Hirschfeld,* 916 F.2d at 575 ("Quid pro quo sexual harassment involves the conditioning of tangible employment benefits upon the submission to sexual conduct.") (citing *Hicks,* 833 F.2d at 1413).

The relevant inquiry in a *quid pro quo* case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job.

*Karibian v. Columbia University,* 14 F.3d 773, 777 (2nd Cir.1994), *cert. denied,* — U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994).

" 'If the plaintiff can show that she suffered an economic injury from her supervisor's actions, the employer becomes strictly liable without any further showing of why the employer should be responsible for the supervisor's conduct.' " *Sauers v. Salt Lake County,* 1 F.3d 1122, 1127 (10th Cir.1993) (quoting *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992)). The reason for this is easily explained: "Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—

either actual or apparently-the law imposes strict liability on the employer for *quid pro quo* harassment." *Karibian,* 14 F.3d at 777.

■ *Quid pro quo* harassment occurs when employment is explicitly or implicitly conditioned on sexual favors. *See Honce,* 1 F.3d at 1089 (" 'Quid pro quo' harassment occurs when housing benefits are explicitly or implicitly conditioned as sexual favors."); *Hicks,* 833 F.2d at 1414. The EEOC guidelines define *quid pro quo* sexual harassment as:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual....

29 C.F.R. §§ 1604.11(a); see *Nichols v. Frank,* 42 F.3d 503, 511 (9th Cir.1994) ("Distilling the EEOC guidelines to their essence, we hold that quid pro quo sexual harassment occurs whenever an individual explicitly or implicitly conditions a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct.").

### Analysis

■ Viewing the evidence in the light most favorable to the plaintiff, the court denies Parkview Hospital's motion for summary judgment on the plaintiff's *quid pro quo* claim. A rational factfinder could conclude that Hill's statements and conduct were not merely boorish and inappropriate but were instead not so subtle sexual advances. A rational factfinder could also conclude that Hill's statements were thinly veiled threats that he would use his authority over Wilkerson to her detriment if she did not yield to his unwanted advances or that he would use his influence to make certain that she lost

---

**9.** "To prevail under a hostile work environment theory, the plaintiff must show that ... conduct 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " *Martin,* 3 F.3d at 1418

(*quoting Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986)); see *Bolden v. PRC Inc.,* 43 F.3d 545, 550–551 (10th Cir.1994); *Arzate v. City of Topeka,* 884 F.Supp. 1494, 1502–1503 (D.Kan.1995).

her job if she did anything to jeopardize his position with Parkview Hospital. Consequently, this issue is not amenable to summary judgment. *See Huitt v. Market St. Hotel Corp.*, No. 91–1488–MLB, 1993 WL 245744, at \*3 1993 U.S.Dist. LEXIS 9665, at \*8 (D.Kan. June 10, 1993) (plaintiff may prove sexual harassment claim by direct or circumstantial evidence; no requirement that plaintiff prove *quid pro quo* claim with direct evidence).

IT IS THEREFORE ORDERED that Parkview Hospital's motion for partial summary judgment (Dk. 48) is granted in part and denied in part as set forth in the body of this opinion.